UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PATRICK T. PALMEN,                                      Case No. 2:23-cv-00062

                           Plaintiff,                   Hon. Paul L. Maloney
                                                        U.S. District Judge
         v.

COMMISSIONER OF
SOCIAL SECURITY,

                           Defendant.
_____/

## OPINION

### I.        Introduction

        This opinion and order addresses Plaintiff Patrick T. Palmen's request for

judicial review in accordance with 42 U.S.C. § 405(g) of the Social Security Act of

Administrate Law Judge (ALJ) Arman Rouf's April 1, 2022, decision denying

Plaintiff's request for Disability Insurance Benefits (DIB).

        The record before the Court reveals that in the summer of 2015, Plaintiff was

involved in a motorcycle accident.  Plaintiff was 52 years of age at the time.  As a

result of the accident, Plaintiff suffers from severe medically determinable

impairments including residuals of thoracolumbar compression fracture and

degenerative disc disease of the cervical and lumbar spine.  Following a hearing, the

ALJ determined that Plaintiff:

        . . . had the residual functional capacity to perform light work as defined
        in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps
        and stairs, balance, stoop, kneel, crouch, and crawl.  He can occasionally

climb ladders, ropes, or scaffolds, and he can occasionally reach overhead with the bilateral upper extremities.  The claimant must avoid exposure to extreme cold, and he can tolerate occasional exposure to wetness and vibration.

The ALJ analyzed Plaintiff's claim using the five-step process and ultimately concluded that Plaintiff was not disabled within the meaning of the Social Security Act from the date of the alleged onset through the date last insured.

Plaintiff asserts that the ALJ made the following errors in coming to his decision:

1. The ALJ failed to consider almost every positive objective exam finding relevant to [Plaintiff's] cervical and lumbar spine impairments.
2. Like his assessment of [Plaintiff's] subjective allegations, the ALJ's consideration of the supportability of the state agency physician's opinion on reconsideration ignores almost every positive physical exam finding.
3. The ALJ did not comply with the regulations in rejecting the opinion of the consultative examiner, and the reasoning he offered does not provide substantial evidence support for his rejection of the opinion.
4. The ALJ erred in evaluating the opinion of [Plaintiff's] neurosurgical specialist by repeating the same errors in ignoring nearly every positive physical exam finding and relying on primary care records out of context.

In other, shorter words, Plaintiff asserts that the ALJ "cherry-picked" Plaintiff's examination findings in evaluating both his subjective complaints and the opinions of his medical examiners.  He further asserts that the ALJ defied the regulations by characterizing Dr. Carlson's medical opinion as "not fully consistent" with Dr. Carlson's examination of Plaintiff.

For the reasons stated below, the Court affirms the ALJ's decision.

## II.    Procedural History

### a.  Key Dates

The ALJ's decision notes that Plaintiff applied for DIB on December 23, 2019, alleging an onset date of October 25, 2018.  (ECF No. 3-2, PageID.24.)  Plaintiff's claim was initially denied by the Social Security Administration (SSA) on June 10, 2020.  The claim was denied on reconsideration on May 3, 2021.  (*Id.*)  Plaintiff then requested a hearing before an ALJ.  ALJ Rouf conducted a hearing on Plaintiff's claim on February 4, 2022.  (*Id.*)  During that hearing, Plaintiff amended the alleged onset date to October 30, 2018.  ALJ Rouf issued his decision on April 1, 2022.  (*Id.*)  Plaintiff requested review of ALJ Rouf's decision on May 5, 2022, which the Appeal Council denied on January 31, 2023.  (ECF No. 3-2, PageID.10-14.)  Plaintiff timely filed this lawsuit on April 2, 2023.

### b.  ALJ's Decision

The ALJ's decision correctly outlines the five-step sequential process for determining whether an individual is disabled.  (ECF No. 3-2, PageID.25-26.)  Before stating his findings at each step, the ALJ concluded that Plaintiff's Date Last Insured (DLI) was December 31, 2020.  (*Id.*, PageID.26.)

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity (SGA) from the amended alleged onset date of October 30, 2018, through December 31, 2020.  (*Id.*)

At Step Two, the ALJ found that the Plaintiff had the following severe impairments:  residuals of thoracolumbar compression fracture and degenerative disc

disease (DDD) of the cervical and lumbar spine.  (*Id.*)  In this portion of his decision, the ALJ discussed a number of non-severe impairments, including hypertension (HTN), sleep apnea, vitamin D deficiency, costochondritis, headaches, urological issues, and depressive disorder.  (*Id.*, PageID.27-28.)  The ALJ determined that these impairments were non-severe based on various examination results and subjective reports by Plaintiff.

Specifically, the ALJ noted that in December of 2019, Plaintiff's abdominal computed tomography (CT) scan did not show acute abdominal process, and his blood pressure measured 114/74.  (*Id.*, PageID.27.)  In November of 2020, Plaintiff reported experiencing only occasional headaches.  Per the medical report of Neurosurgery Endovascular Associates, Plaintiff's hematology system was negative for symptomology as of August of 2021.  (*Id.*)  And in October of 2021, another abdominal CT scan revealed non-obstructing lower pole calculi, with no hydronephrosis.  As to Plaintiff's vitamin D deficiency and sleep apnea, the ALJ noted that Plaintiff's medical records generally demonstrated a past history of the issues, with no current treatment.  (*Id.*)  Revisiting Plaintiff's headaches, the ALJ pointed out that during the administrative hearing, Plaintiff reported that Aleve works fairly well in addressing the headaches.

In finding that the Plaintiff's medically determinable mental impairment of depression did not cause more than a minimal limitation and was therefore non-severe, the ALJ discussed the Paragraph B criteria.  (*Id.*, PageID.27-28.)  The ALJ found that: (1) Plaintiff had mild limitation in the first functional area

4

(understanding, remembering or applying information); (2) Plaintiff had no limitation in the second functional area (interacting with others); (3) Plaintiff had mild limitation in the third functional area (concentrating, persisting or maintaining pace); and Plaintiff had a mild limitation in the fourth functional area (adapting or managing oneself). The ALJ supported these findings with the records of Plaintiff's treatment at United Hospital System from December of 2018 to February of 2020. (*Id.*)

At Step Three, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*, PageID.28.) The ALJ specifically commented on listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root) and 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina). (*Id.*, PageID.28-29.)

Before going on to Step Four, the ALJ found that the Plaintiff had the RFC:

> **[T]o perform light work as defined in 20 CFR 404.1567(b) except the [Plaintiff] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can occasionally climb ladders, ropes, or scaffolds, and he can occasionally reach overhead with the bilateral upper extremities. The claimant must avoid exposure to extreme cold, and he can tolerate occasional exposure to wetness and vibration.**

(*Id.*, PageID.29.)

The ALJ devoted six pages to discussing Plaintiff's RFC. This discussion included the following:

- a summary of the regulations regarding how the ALJ will address Plaintiff's symptoms (*id.*, PageID.29);

- a summary of Plaintiff's statements (*id.*, PageID.29-30);

- a summary of the medical records relating to the abdominal and back pain resulting from his motorcycle accident (*id.*, PageID.30-31);

- a summary of opinions by: (1) Dr. Max Ots in April of 2018, (2) disability determination services (DDS) physician Dr. Edward Brophy in May of 2020, (3) Dr. Gary Kilpela (Psy. D.) in November of 2020, (4) DDS physician Dr. Dale Blum in December of 2020, (5) Dr. Toby Carlson in April of 2021, and (6) Dr. Arvind Ahuja in September of 2021 (*id.*, PageID.31-33); and

- an explanation of how the ALJ arrived at his decision on the Plaintiff's RFC (*id.*, PageID.34).

In determining Plaintiff's RFC, the ALJ noted that in February of 2017, Plaintiff underwent a Magnetic Resonance Imaging (MRI) of his cervical spine which revealed multi-level DDD, spondylotic spurring, facet arthropathy, a C5-6 disc protrusion, and an occluded left vertebral artery." (*Id.*, PageID.31-32.) The ALJ also noted that during a consultative examination in April of 2021, Plaintiff "was diagnosed with status post motorcycle accident along with multiple rib fractures, a thoracic spine compression fracture, and chronic low back and neck pains." (*Id.*, PageID.30.)  Furthermore, a medical report from August of 2021 reflected that

Plaintiff "had hyper-reflexive legs, daily neck pain, and impaired heel walking." (*Id.*, PageID.33-34.)

However, medical records from the United Hospital System from December of 2018 to February of 2020 consistently reflected that Plaintiff had "intact and equal strength, intact extremity motions, normal cognition and communication, and a normal mood and affect, with no musculoskeletal/extremity deformities or neurological/motor/sensory deficits. (*Id.*, PageID.30.) And the August of 2021 record similarly reported "full muscle strength, a normal gait, and unimpaired tandem and toe walking." (*Id.*, PageID.31.) Furthermore, records of examinations at Froedtert in December of 2019 and August of 2021 "showed full ranges of musculoskeletal motions, a steady gait, and full extremity strength, with no neurological/ motor/sensory deficits or extremity deformities. (*Id.*)

Considering the records together, the ALJ determined that: (1) Dr. Ots' opinion that Plaintiff was "unable to return to work" was unpersuasive; (2) (DDS) Dr. Brophy's opinion that Plaintiff was "able to perform medium work" was unpersuasive; (3) Dr. Carlson's opinion that Plaintiff "able to perform a modified sedentary level of activities, which included the ability to lift up to five to ten pounds occasionally, with no extensive bending or twisting at the neck or waist" were not persuasive; (4) (DDS) Dr. Blum's opinion that Plaintiff was "able to perform light work, with postural limitations and restrictions in exposure to wetness, vibration, and extreme cold," was somewhat persuasive; and (5) Dr. Ahuja's opinions that Plaintiff was "able to

lift/carry less than ten pounds rarely, and that Plaintiff would "miss work more than four days per month" were unpersuasive.  (*Id.*, PageID.31-33.)

At Step Four, the ALJ concluded that, through the DLI, the Plaintiff was unable to perform Past Relevant Work (PRW) as an electrician.  (*Id.*, PageID.34.)

At Step Five, the ALJ considered the Plaintiff's age, education, work experience and RFC, and determined that Plaintiff "had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy."  (*Id.*, PageID.35.)   Specifically, the ALJ noted that Plaintiff was 57 years old at the DLI, that he has at least a high school education, and that he acquired skills including "installing electrical equipment, pulling wires, and using hand and power tools" while performing his PRW.  (*Id.*)  The vocational expert testified that an individual with Plaintiff's RFC and acquired skills could perform work as a wire harness assembler, a coil winder, and an electrical continuity tester, altogether totaling 14,900 jobs in the national economy.  (*Id.*, PageID.36.)

## III.   Standard of Review

Review of an ALJ's decision is limited to two issues: (1) "whether the ALJ applied the correct legal standards," and (2) "whether the findings of the ALJ are supported by substantial evidence."  *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); 42 U.S.C. § 405(g).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. 42 U.S.C. § 405(g).

Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and whatever evidence in the record fairly detracts from its weight. *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984) (citations omitted). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords the administrative decision maker considerable latitude and acknowledges that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).

## IV. Analysis

As provided above, Plaintiff complains that ALJ Rouf "cherry-picked" Plaintiff's examination findings in evaluating both his subjective complaints and the opinions of his medical examiners, thereby failing to consider all of the evidence in the record. (ECF No. 13, PageID.715-725.)

9

### a. Subjective Complaints

Plaintiff first argues that in determining that his allegations were "not entirely consistent" with the evidence on the record, ALJ Rouf "failed to consider almost every positive objective sign consistent with [Plaintiff's] allegations, leading to a skewed presentation of the objective medical record."  (ECF No. 13, PageID.717.)  Specifically, Plaintiff complains that the ALJ did not properly consider the results of the examinations conducted by Dr. Carlson and Dr. Ahuja.  (*Id.*, PageID.717-718.)

Plaintiff underscores that Dr. Carlson "noted pain upon straight leg raise testing and subjective diminution of touch sensation in the volar aspect of the right forearm extending into the axilla."  (*Id.*, PageID.718 (citing ECF No. 3-8, PageID.528).)  And Dr. Carlson determined that Plaintiff had a grip strength of 60 pounds bilaterally—far below the mean grip strength of a man Plaintiff's age.  (*Id.*)  Furthermore, Dr. Ahuja reported:

- "Light touch — Decreased — Note: legs bilaterally."
- "Hyperpathia—Note: Underside of arm to medial wrist." . . .
- Absent reflexes in the right bicep (C5-C6 dermatome) and decrease reflexes in the left biceps (C5-C6), and right brachioradialis (C5-C6)
- Brisk reflexes in the left and right knee (L2-L4 dermatome).
- "Walking on heels impaired." . . .
- Tenderness and spasticity in the cervical spine.
- Tenderness in the low thoracic and lumbar spine.

(*Id.*, PageID.717 (citations omitted) (footnote omitted) (citing ECF No. 3-8, PageID.559).)

An ALJ's factual findings concerning a claimant's subjective symptoms are peculiarly within the province of the ALJ.  *Gooch v. Secretary of Health & Human*

*Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020) ("It is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements."). The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed[.]" *Kuhn v. Comm'r of Soc. Sec.*, 124 F. App'x 943, 945 (6th Cir. 2005).

The SSA – and any ALJ who subsequently reviews the case – considers the following factors with respect to a claimant's symptoms:

(i)     [The claimant's] daily activities;

(ii)    The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;

(v)     Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms;

(vi)    Any measures [the claimant] use[s] or ha[s] used to relieve [the claimant's pain or other symptoms (e.g., lying flat on [their] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)   Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

As a starting point, the ALJ spoke with Plaintiff during his hearing.  (ECF No. 3-2, PageID.47-60.)  During his hearing, Plaintiff testified that as of his DLI, he had crushed vertebra in the middle of his back as well as some damaged vertebra in his neck.  (*Id.*, PageID.53.)  Plaintiff explained that the injuries limited his motion.  (*Id.*, PageID.54.)  He said that if he walked more than a block or two, his legs and lower

back would hurt.  In addition, he would get headaches.  (*Id.*)  Beyond walking, Plaintiff reported feeling back pain when bending.  He also reported experiencing pain in his legs any time he was in an upright position. (*Id.*)  When asked specifically about his headaches, Plaintiff reported getting headaches two or three times a week for at least an hour. (*Id.*, PageID.55.)  But Plaintiff reported that taking Aleve seemed to "work fairly well" in addressing his headaches. (*Id.*)  Plaintiff also reported using medical marijuana to manage his pain. (*Id.*, PageID.56.)  Beyond those medications, Plaintiff indicated that he had not sought or received treatment for his neck or back issues since before October 30, 2018.  (*Id.*, PageID.55, 59.)

Plaintiff further reported that in 2020, his typical day involved waking up, getting out of bed a few hours later to shower, making himself something to eat for breakfast, doing a small chore such as washing dishes, making himself lunch, taking care of another small project to maintain the house such as doing laundry, and making himself dinner or snacks. (*Id.*, PageID.57-58.)  Plaintiff explained that these activities were separated by stints of sitting, laying down, or napping. (*Id.*)  In response to his attorney's questioning during the hearing, Plaintiff reported that memory, concentration, and attention issues "hugely" interfered with his ability to work, even around the house. (*Id.*, PageID.62.)  More specifically, Plaintiff reported difficulty with remembering and organizing things. (*Id.*)

ALJ Rouf correctly stated the 2-step process for evaluating Plaintiff's symptoms as follows:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(*Id.*, PageID.29.); *see* SSR 16-3p. The ALJ then devoted more than two pages of his decision to Plaintiff's experiences with "crushed back and neck vertebrae, limited arm and back motions, walking limitations, lower extremity pain, memory and task completion issues, and anxiety when leaving the house." (*Id.*, PageID.29-31.)

ALJ Rouf noted that in an adult function report dated February of 2020, Plaintiff represented that he could prepare meals, do household chores, perform yardwork (albeit with difficulty), shop, and engage in various other activities necessary to live alone. (*Id.* (citing ECF No. 3-6, PageID.280-283).) He further represented that he could "usually finish what he started" and "follow instructions." Beyond that, the ALJ noted that Plaintiff's medical records repeatedly demonstrated: a healthy appearance, a non-antalgic/steady gait, Plaintiff's ability to "perform activities of daily living," full muscle strength, normal ranges of motions (except for the neck and lumbar spine), and "no neurological/motor/sensory deficits or extreme deformities." (*Id.*, PageID.30-31 (citing ECF No. 3-8, PageID.420-421, 430-431, 440, 451, 470, 476, 527-528, 557, 559; ECF No. 3-9, PageID.579, 590, 599-600).) They further demonstrated "decent grooming and hygiene, mild dysphoria, an adequate

fund of vocabulary, average intelligence, a normal attention span, intact orientation, intact abstract and conceptual reasoning, and normal immediate, short, and long-term memory functions." (*Id.* (citing ECF No. 3-8, PageID.524).)

But ALJ Rouf recognized — either in evaluating Plaintiff's symptoms or elsewhere in his decision — that an MRI conducted in February of 2017 showed "multi-level DDD, spondylotic spurring, facet arthropathy, a C5-C6 disc protrusion, and an occluded left vertebral artery." (*Id.*, PageID.32 (citing ECF No. 3-7, PageID.347-348).) The ALJ noted that DDS Dr. Blum's review and report of medical evidence revealed "decreased ranges of cervical and lumbar spine motions." (*Id.* (citing ECF No. 3-3, PageID.144, 150.)   And the ALJ noted that during an appointment with Dr. Ahuja in August of 2021, Plaintiff demonstrated "hyper-reflexive legs, daily neck pain, and impaired heel walking." (*Id.*, PageID.33-34 (citing ECF No. 3-8, PageID.559-560.)

With Plaintiff's statements and medical records in mind, the ALJ concluded that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the medical evidence established the claimant was able to function even with his impairments.

(*Id.*, PageID.30.)

The Court finds that the ALJ's determination with respect to the consistency of Plaintiff's statements was reasonable and supported by substantial evidence.

Plaintiff argues that the ALJ "cherry-picked" the record, but as this Court has previously noted, "[t]he argument that the ALJ mischaracterized or 'cherry-picked' the record is frequently made and seldom successful, because 'the same process can be described more neutrally as weighing the evidence.'" *Waite v. Comm'r of Soc. Sec'y*, No. 1:16-CV-1163, 2017 WL 3887105, at *3 (W.D. Mich. Sept. 6, 2017) (quoting *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009)).  That is what ALJ Rouf did here: he weighed the evidence before him and determined that Plaintiff's statements regarding the intensity, persisting, and limiting effects of his symptoms were not entirely consistent with his medical records.  And re-weighing that evidence is not within the province of this Court.

### b.  Medical Opinion Evidence

Plaintiff next complains about the ALJ's assessment of three separate medical opinions: (1) the opinion of DDS Dr. Dale Blum, (2) the opinion of consultative examiner Dr. Toby Carlson, and (3) the opinion of neurosurgical specialist Dr. Arvind Ahuja.

For claims filed after March 27, 2017, the Commissioner—and any ALJ who subsequently reviews the case—will not give specific evidentiary weight, including controlling weight to opinions, but will articulate the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(a).  An ALJ uses five factors to articulate the persuasiveness of a medical opinion: (1) supportability of the relevant objective evidence and supporting explanations, (2) consistency of the opinions with medical evidence or nonmedical evidence in the record, (3) relationship with the claimant, (4)

specialization, and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(a) and (c).

The most important factors an ALJ considers are the supportability and consistency of the medical opinions. 20 C.F.R. § 404.1520c(a). The ALJ is required to articulate how he or she considered the medical opinions and prior administrative medical findings and explain the supportability and consistency factors in the decision. 20 C.F.R. § 404.1520c(b)(2).

### i. Blum Medical Opinion

The ALJ stated the following with respect to Dr. Blum's opinion in his hearing decision:

> In December of 2020, a DDS physician found the claimant had no severe mental impairment, and no more than mild limitations in the four functional areas of the 'B' criteria. The DDS physician also concluded the claimant was able to perform light work, with postural limitations and with restrictions in exposure to wetness, vibration, and extreme cold (Exhibit B4A). The undersigned finds the DDS opinions somewhat persuasive since the opinions are somewhat supported by the DDS review and report of the medical evidence, which indicated the claimant mostly had mild mental functioning limitations, good abstract thinking, decreased ranges of cervical and lumbar spine motions, cervical spine DDD, and a T12 compression fracture (see pages 9 and 15 of Exhibit B4A). The undersigned also finds the DDS opinions are somewhat persuasive because they are somewhat consistent with the medical record. In February of 2017, a cervical spine MRI scan showed multi-level DDD, spondylotic spurring, facet arthropathy, a C5-6 disc protrusion, and an occluded left vertebral artery (see pages 1-2 of Exhibit B1F). During a consultative exam performed in November of 2020, the claimant exhibited decent grooming and hygiene, mild dysphoria, an adequate fund of vocabulary, average intelligence, a normal attention span, intact orientation, intact abstract and conceptual reasoning, and normal immediate, short, and long-term memory functions (see page 2 of Exhibit B6F).

(ECF No. 3-2, PageID.32.)

Plaintiff contends that ALJ Rouf erred in determining that Dr. Blum's opinion was "somewhat persuasive." (ECF No. 13, PageID.720.) As in evaluating Plaintiff's subjective complaints, Plaintiff posits that there is no evidence that the ALJ considered the abnormal findings of Dr. Carlson and Dr. Ahuja in evaluating the

persuasiveness of Dr. Blum's opinion.  In other words, Plaintiff asserts that the ALJ "cherry-picked" the medical evidence in order to find the opinion "somewhat persuasive."

As before, Plaintiff's "cherry-picking" argument falls short of establishing a reversible error in the ALJ's decision.  The ALJ explained that Dr. Blum's opinion was somewhat consistent with his (Dr. Blum's) own review and report of the medical record, which indeed reflected that Plaintiffs ability to "understand and remember instructions" and "adapt to changes in a work setting" were mildly impaired, that Plaintiff had "[g]ood abstract thinking," and that Plaintiff had a "DROM of cervical and L/S spine . . . known DDD of cervical spine and compression fracture of T12." (ECF No. 3-3, PageID.144, 150.)  The ALJ further identified the medical evidence that somewhat supported Dr. Blum's medical opinion, including the results of the 2017 MRI, (ECF No. 3-7, PageID.347-348), and the consultative examination performed by Dr. Gary Kilpela in November of 2020 (ECF No. 3-8, PageID.523-525.) And, as recognized above, the ALJ discussed Plaintiff's "hyper-reflexive legs, daily neck pain, and impaired heel walking" elsewhere in the decision; those findings come from Dr. Ahuja's examination of Plaintiff in August of 2021.  (ECF No. 3-2, PageID.33-34 (citing ECF No. 3-8, PageID.559).)  In the end, the ALJ imposed more restrictions than were recommended by Dr. Blum.  (*Id.*, PageID.29.)

### ii.  Carlson Medical Opinion

The ALJ stated the following with respect to Dr. Carlson's opinion in his hearing decision:

> In April of 2021, Dr. Toby Carlson consultatively evaluated the claimant, and determined the claimant was able to perform a modified sedentary level of activities, which included the ability to lift up to five to ten pounds occasionally, with no extensive bending or twisting at the neck or waist (see page 2 of Exhibit B7F).  The undersigned finds Dr. Carlson's opinions are not persuasive since they are not fully supported by Dr. Carlson's exam findings.  The claimant demonstrated a non-antalgic gait, full muscle strength, and normal ranges of motions (except for the neck and lumbar spine) (see page 2 of Exhibit B7F).  The undersigned also finds Dr. Carlson's opinions are not persuasive because they are not consistent with the medical record.  In December of 2019 and in August of 2021, exams of the claimant at Froedtert showed full ranges of musculoskeletal motions and full extremity strength, with no neurological/motor/sensory deficits or extremity deformities (see pages 17-18 and 29 of Exhibit B12F).

(*Id.*, PageID.32-33.)

Once again, Plaintiff asserts that in evaluating the persuasiveness of Dr. Carlson's medical opinion, ALJ Rouf "fail[ed] to acknowledge almost every positive physical exam finding of the record."  (ECF No. 13, PageID.723.)  In particular, the ALJ's decision failed to mention Dr. Carlson's documentation of: (1) pain upon straight leg raising, (2) subjective diminution of touch sensation in the right forearm, and (3) well below-average grip strength, and it failed to discuss all of the positive findings within Dr. Ahuja's examination of Plaintiff.  Plaintiff additionally argues that the ALJ erred by finding that Dr. Carlson's opinions were not persuasive because they were "not fully supported" by his examination findings, citing opinions out of the U.S. District Court for the Southern District of Ohio wherein the court explained that "[n]either the supportability factor nor any other regulatory factor permit[s] the ALJ to reject [a medical opinion] by characterizing it as 'not fully supported by the record.'" (*Id.*, PageID.733 (first quoting *Lay v. Comm'r of Soc. Sec.*, No. 3:17-cv-23, 2018 WL 2990186, at *4 (S.D. Ohio June 14, 2018); and then collecting cases).)

Once again, Plaintiff's "cherry-picking" argument falls short of establishing a reversible error in the ALJ's decision.  ALJ Rouf articulated his bases for finding that

Dr. Carlson's opinion was not persuasive, including his analysis of the supportability and consistency factors.  The ALJ correctly noted that during his examination with Dr. Carlson, Plaintiff demonstrated normal range of motion of "the small joints of the hands, wrists, elbows, and shoulders" as well as "the hips, knees, and ankles." (ECF No. 3-8, PageID.528, 532-533.)  Furthermore, Plaintiff "ambulate[d] without a limp." (*Id.*, PageID.528, 531)  And during his August of 2021 appointment at Froedtert, Plaintiff did demonstrate a "full and active range of motion," "steady gait," "no focal neurologic motor or sensory deficits," and "[e]qual strength 5/5 in all 4 extremities." (ECF No. 3-9, PageID.579.)

As to Plaintiff's argument that the regulations do not permit an ALJ to reject a medical opinion on the grounds that it is not fully consistent with or supported by the record, the Court notes that ALJ Rouf did no such thing.  Rather, the ALJ found that Dr. Carlson's opinion was not persuasive because it was not fully supported *by his own examination* of Plaintiff, *and* because it was not consistent with the medical record, including the examinations of Plaintiff conducted at Froedtert.  As such, ALJ Rouf did not commit a legal error in evaluating the persuasiveness of Dr. Carlson's medical opinion.

### iii.  Ahuja Medical Opinion

The ALJ stated the following with respect to Dr. Ahuja's opinion in his  hearing decision:

In September of 2021, Dr. Arvind Ahuja, a physician at Neurosurgery Endovascular Associates, provided two opinions regarding the claimant's functioning (Exhibits B8F and B10F). He concluded the claimant was able to lift/carry less than ten pounds rarely and to sit/stand/walk less than two hours, with severe limitations in neck/head movements, postural activities, and manipulative functions. Dr. Ahuja indicated the claimant would miss work more than four days per month (Exhibits B8F, B9F, and B10F). The undersigned finds Dr. Ahuja's opinions are not persuasive since they are not supported by the doctor's medical report from Neurosurgery Endovascular Associates dated August of 2021, which reflected the claimant was able to perform activities of daily living and to do housework, albeit with limitations (see page 2 of Exhibit B11F). An examination revealed full muscle strength, a normal gait, and unimpaired tandem and toe walking (see page 4 of Exhibit B11F). The undersigned also finds Dr. Ahuja's opinion is not persuasive because it is not consistent with the overall medical evidence. In December of 2019 and in August of 2021, exams of the claimant at Froedtert showed full ranges of musculoskeletal motions and full extremity strength, with no neurological/motor/sensory deficits or extremity deformities (see pages 17-18 and 29 of Exhibit B12F). In addition, Dr. Ahuja completed these two medical opinions within days of each other and they differ in some respects, but Dr. Ahuja provided no explanation for the differing limitations. For example, on September 3, 2021, Dr. Ahuja opined that the claimant could use his bilateral upper extremities to handle 10%, finger 0%, reach in front of the body 5% and reach overhead 0% of an 8-hour workday. However, just days later, on September 7, 2021, Dr. Ahuja opined that the claimant could use his bilateral upper extremities to handle 15%, finger 20%, reach in front of his body 10-15%, and reach overhead 0-10% of an 8-hour workday. The lack of an adequate explanation for the differing limitations between the opinions reduces the persuasiveness of them.

(ECF No. 3-2, PageID.33.)

Although the ALJ's written evaluation of Dr. Ahuja's opinions is perhaps the most in-depth evaluation of medical opinions in the hearing decision, it appears to be the evaluation with which Plaintiff takes the most issue. As one might expect by this point, Plaintiff complains that the ALJ ignored the positive examination findings from Dr. Ahuja that were discussed above. (ECF No. 13, PageID.725); *see supra* p. 10. Additionally, Plaintiff asserts that ALJ Rouf erred by characterizing Dr. Ahuja's opinion as inconsistent with his examination of Plaintiff based on Dr. Ahuja's determination that Plaintiff could perform daily activities of living and do housework with limitations; the ALJ did not identify the specific activities that Plaintiff could perform or what limitations Plaintiff had in performing them, and Plaintiff asserts that such identification was necessary to conclude that Dr. Ahuja's medical opinions

were inconsistent with his examination.  (ECF No. 13, PageID.724-725.)  Finally, Plaintiff says that the while the ALJ correctly concluded that Dr. Ahuja's medical opinions were inconsistent as to Plaintiff's manipulative limitations, and correctly considered such inconsistencies in evaluating the persuasiveness of Dr. Ahuja's medical opinions, that conclusion alone is insufficient to support the ALJ's conclusion that Dr. Ahuja's opinions were not persuasive.  (*Id.*, PageID.725.)

For the fourth and final time, the Court finds that Plaintiff's "cherry-picking" argument falls short of establishing a reversible error in the ALJ's decision.  The ALJ laid out his reasons for finding Dr. Ahuja's opinions to be unpersuasive, specifically that the opinions were not supported by some of Dr. Ahuja's examination findings, that the opinions were internally inconsistent without justification, and that the opinions were inconsistent with Plaintiff's overall medical record.  Indeed, Plaintiff reported that he "is currently able to do activities of daily living with limitations and able to do housework with limitations" during his examination with Dr. Ahuja.  (ECF No. 8-3, PageID.557.)   Plaintiff demonstrated: (1) "[n]o impairment of tandem walking," (2) "[n]o impairment of walking on toes," and (3) "5/5 normal muscle strength – all muscles."  (*Id.*, PageID.559.)  And Plaintiff concedes that there were inconsistencies between the  manipulative limitations set forth in Dr. Ahuja's opinions.  (ECF No. 13, PageID.725; *see also* ECF No. 3-8, PageID.540, 553.) Furthermore, the ALJ correctly identified and described contrary findings in the Froedtert records discussed above.  *See supra* p. 19.  And the ALJ further discussed

21

and considered Dr. Ahuja's examination findings elsewhere in the record.  (ECF No. 3-2, PageID.33-34 (citing ECF No. 3-8, PageID.559).)

Moving forward to Plaintiff's assertion that the ALJ erred in finding that Dr. Ahuja's medical opinions were contrary to his note that Plaintiff was able to perform daily activities and household chores with limitations, the Court emphasizes that these were not the only portions the Dr. Ahuja's examination that the ALJ identified as contrary to the Dr. Ahuja's medical opinion.  The ALJ also pointed to Plaintiff's demonstrated lack of walking impairments (with the exception of the impaired heel walking acknowledged elsewhere in the decision) and normal muscle strength. Furthermore, the ALJ's hearing decision is rife with references to the kind of daily activities and housework undertaken by Plaintiff, including cooking breakfast, cooking dinner, cooking on the grill, basic cleaning, operating a riding mower, shopping, managing funds, paying bills, showering, and tending to his personal needs whilst living alone.  (ECF No. 3-2, PageID.30-31, 34.)

## V.    Conclusion

Ultimately, the Court is sympathetic to Plaintiff's medical conditions.  But there is substantial evidence to support the ALJ's determination that Plaintiff is not disabled.  To find otherwise would require this Court to re-weigh the evidence in the record, contrary to the applicable standard of review.  Accordingly, ALJ Rouf's decision is affirmed.  A separate judgment shall issue.

Dated:   September 10, 2024                                   /s/  Paul L. Maloney
                                                                         Paul L. Maloney
                                                                         United States District Judge

22